Good afternoon. My name is Jim Ray. I'm here representing the Plano Appellant Landowners. In all due respect to the District Court, who I respect very much by the way, this is not simply a Plano-Mill contract plan. This is a very important economic development project that serves to define the relationship between the developers and the city in context of economic development. This issue about having contractual rights in sovereign actions impacts every single project of magnitude in this circuit. There's no such thing as a major project that's developed without a Corollary Development Agreement in today's time. Counsel, what property right is created outside of the contract? Do you allege that there is a property right other than what the contractual rights are? Correct. The property rights that we have in this case are our vested rights in the actual development that's already been approved. We built over $3.2 million for public improvements, not as according to this particular development agreement, but an agreement that was fulfilled prior to the engagement of the district. So by the time the agreement went into effect, we had already approved and paid for $3.2 million plus in public improvements that the city recognized that we had developed. Am I correct in answering Judge Englehart's question saying the property rights that you've acquired are as a result of this development and contract? No, sir. No, Your Honor. We acquired our rights in development in the normal course of business. In other words, when we made a permit application, we acquired our rights in the continuing development process. That's all governed by Chapter 211 and 212 of the Local Government Code and Chapter 245 of the Local Government Code. We acquired vested rights not only in our present development, but also in a past development that was not complete, but which had permits that were still viable and in force, and also had a vested property interest in our continuing permitting rights under state law. What happened here is that the city came back four years later, passed a new ordinance, and then on its own decided that that new ordinance trumped the law. In other words, it did not apply. We were not grandfathered. Our rights were not honored. But they didn't tell us that until it was too late to apply. So that is the real essence of the problem here. They passed an ordinance which, as applied, is invalid to us. Now, the city argues that we did not assert that the city was acting in connection with an ordinance, but that's just simply not true. The drainage ordinance that was passed in 2000, I believe it was 2012, was directly responsible for, at least that's what they said, the implication is that they were trying to enforce that ordinance by shutting our development down. Now, the question that people keep saying is, did they really just say they were going to shut you down, or did they shut you down? The answer is, unlike a typical contract, the city has the power. It's cloaked in the mantle of the state. They are the regulatory body that determines your ability to permit, to develop, to plant, and to do the kinds of things that are required to go forward and to build a project of this magnitude. Counsel, what caused the harm, in this case, to your client? Was the changing of the rule at such a late time so that your client was almost impossible able to comply with it? Was that the act, or was it a failure to pay? They're in a sequence. I'm going to answer it that way. The fact that they changed the rules and stopped our development is one violation, and that should be enough trigger-taking under state law. The second thing is, and I think you asked a very important question, we have a second property interest in that right to be reimbursed for the public improvements that were already built. So we have property interests that are vested over here because we built millions of dollars worth of properties based on permits that are still valid. And I would encourage the court, if you haven't already, please look at the exhibits. Those exhibits say things that are different than what you're hearing from Bruce. The fact that we have vested rights in the development with permits that are still active, that have not been forfeited, that have not expired, and then for them to come in and say, oh, by the way, you can't use those because we've changed the rules, that just violates everything about our vested rights analysis. The district court focused on our precedent, Preston Hollow, correct? I'm sorry. The district court's ruling had heavy focus on our decision, am I mispronouncing it, Preston Hollow. Yes. And said that there, the dispute sounds in contract, and additionally noted that the two different claims, the contract breach and the takings, hadn't been pled alternatively. When you look at your complaint, it's not easy to see, except in the introductory section, an alternative pleading. Well, the first thing that we would notice about the alternative pleading is that we did plead two different, completely different claims. We pled takings claims under both the federal and the state constitutions. We also pled independently and alternatively. The breach of the good faith requirement was expressly made a part of the contract. Those words were actually in the pleading. I believe it's from page 6, paragraph 28. The word in the alternative is there. So I understand what the court's saying. I don't know if it matters that we only put it in the alternative in the introductory section or if we needed to put it someplace else, too. But I do have a case before that just says that in the federal jurisdiction, here at least in the western district, the word alternative is not required. We cited that case yesterday. It's El Paso Disposal v. EQ Labs. And if you look at the pleading in the alternative section, it just simply says that they can cite no case law for the contention that plaintiffs require to plead claims in the alternative capacity. We were a little bit surprised at that part of the opinion. We did not know exactly how to do that. Now, I think personally – Do you want to? Go ahead. No, you go ahead. I think it's correctly decided on the facts before this court. I think Preston Hollow is decided correctly. The problem is that the rule in Preston Hollow did not need to be expanded. It didn't need to go to the corollaries and the exceptions because the facts didn't require it. Now, Preston Hollow basically had a lender who felt that he had a default under his loan agreement, and he was claiming that that was a taking because of his default. Been in the business for 52 years. That's not a taking. That's just simply what happens in the lending business. They exchange their money for loan agreements, notes, deed to trust, security agreements. Sometimes they pay like they're supposed to. Sometimes they don't. He had remedies. He had security agreements. He had nonjudicial judicial foreclosure. He had all those kinds of things that he chose to start a taking, and the court correctly decided that there was just no sovereign act on which to base this. But the rule that Preston Hollow bases their claim on is actually based on the Horowitz case. The Horowitz case, Horowitz v. United States of America, is a Supreme Court case. What it really says is it says the government is not liable for its general and public acts as a sovereign, which obstruct the performance of its contract. But the corollary in the cases that have adopted that rule subsequently to that say that actions that are not public in general are applicable, and those actions which are principally and primarily directed at the employees or at our contract rights or our property rights, which had already become vested, are not protected by sovereign immunity. In other words, it's just rational. You can't have a government who enters into a contract and says, oh, and by the way, we're going to do things of general applicability. That doesn't violate the contract. But in our case, it's specific. It's under the Penn Central standard when you say, what is the character? The character of this action is it's directed principally and exclusively to us. And as our Supreme Court has suggested in the recent case of Lake Houston, which both sides have cited, and I recommend that case. That's very, very close to our point for us, is that you have to look at that very, very carefully. What's the status of the state case now, the contract breach case? What happened is it's been removed back to state court. The current status is that the taking of the Constitution is the primary focus, and we have not pursued the contract breach in state court. And the reason is it's simply overly complicated, something that is already complex enough. And that is that we have a sovereign or governmental entity who's doing things that are not allowed pursuant to vested rights analysis, either common law. 245 is not the only way that you get vested. You can have common law vesting, which is what we have where we spend millions of dollars on approvals that had already happened and occurred, and we had valid permits. That has nothing to do with Chapter 245. Chapter 245 says you can't change the rules in the middle of the game. The first permits issued in the project go for the life, extended life of the project. So we have our past vesting. We have our future vesting. They ignored both of those, and the opinion just simply did not deal with our property interests. We believe the focus of this case is on the question of whether or not the government acts as a governmental entity is held accountable. And we think that the Horowitz rule basically says that. It says when the city's actions are primarily and principally directed at our rights, which had already become vested, those are protected under state law. And the doctrine of sovereign immunity simply does not insulate the city from liability in those instances. Horowitz is old, and most of these difficult cases are filtering through the Court of Claims and the Federal Circuit. So what one case would you say is most enlightening as to when the level of sovereign action justifies the taking claim? And specifically my concern is here the facts look like a lot of inaction. They failed to vote to extend the Clomar waiver. They failed—so it's more sovereign inaction on top of an alleged original breach. Yes, sir. I agree with you. I would look at the Sunil Oil v. the Court of Claims case 572 F. 2nd 786. Wait, I'm sorry. Which one is that? Sunil Oil v. the United States 572 F. 2nd 786. It's a 215 Court of Claims 1978 case. And what it does is it interprets the Horowitz rule, and it tracks exactly our argument until it gets to the point where there's apparently some differences in the way offshore leasing from the United States of America is handled in the way development is handled in Texas. They come in. They do the whole analysis. They do sovereign acts. They say when they're general, they don't apply, but when they're specific, they do. And they say sovereign energy would not normally apply here, but then apparently according to the offshore drilling requirements, the secretary has a different kind of authority. The secretary would be the lessor in that case, have the authority from the lease to actually grant a permit and build a platform. Here, the city of Mesquite in its governmental capacity is uniquely required to handle the permit. It's not handling that permit as a co-equal private citizen in a contract. In the whole Horowitz rule, the Crystal Hall rule, I think you all agree with this, that they've become like private citizens. What could a private citizen do? Well, a private citizen can't change the subdivision rules. They can't come in there and tell you you cannot get your approvals necessary to comply with your timing. They can suggest, for example, that it might be wrong. My office is full of that kind of stuff. People argue all the time. But when you go to the city and you say, I need to apply for an application for a permit, the state law takings questions, starting with Westgate, you say. It's certainly described again with the Commons of Lake Houston case. The denial of a permit in Texas equals a taking. The other thing is if you look at the Coppola case, Coppola versus San Antonio. Coppola states a taking under Texas law for the thwarting of a development that's already been approved. That's a very important case here for another reason, and that is a remand from the Supreme Court. They made the same argument that the city is making, and that is, oh, by the way, there's no harm or foul because— You saw the case before. You have reserved rebuttal time, but your time— I have five minutes. Did I use it up? No, no, no. You have that full amount. It's just now the red light's on, so you'll be able to get back up. Okay. Can I sit? So you should sit now. We'll hear from opposing counsel. Thank you. Mr. Dunn. May it please the court, Judge Kinson, counsel. My name is Timothy Dunn. I'm here representing the city of East Texas. First, Judge Kinson, I want to answer your question about what's happening with the trial court and the state court. The state court, we went back down. The plaintiffs there filed a second amendment petition still asserting their state law takings claim, still asserting their Texas Declaratory Judgment Act claims, which we didn't talk about yet. The city filed a plea to the jurisdiction. That hearing has been held that is currently under advisement of the district judge in the state court. She has not yet ruled, so that's what that says. So there's no contract breach claim? They have not asserted a breach of contract claim in the state court at this time. That is correct. I wanted to address very briefly just some factual things about the CLOMR. I want to make sure that the panel understands. So if you read their pleading, their inverse combination claim in the hundreds, of the early hundreds in their complaint paragraph numbers, it doesn't really talk about the CLOMR. That seems to have popped up in the reply brief. They're now asserting that the—and they say the apparent denial. They never said there was a final requirement for a CLOMR because there never was. And we know there never was because that's what's in the complaint. And so if you actually can read the complaint and then you compare it with— it's the letter which is exhibit B to their complaint. It's the letter that was sent two weeks before the city council meeting that occurred where there's no extension of the deadlines, and they're explaining why they need more time. The first part of that deals with, well, we need the CLOMR, but it actually says the CLOMR is not that big a deal. We'll be able to deal with the CLOMR. It goes on and talks about we also need text dot approval. That's going to take at least another year, maybe two. We also need some money from you, city. We're going to need some more money. You might get it back. You might not. And it explains that what happened was a new investor came in to try to buy 11 acres from them. They had a pre-application meeting for some of the development with the city, and at that point in time, whomever was there with the city said, hey, you need a CLOMR because you're doing work in the floodplain. Of course you need a CLOMR. And we know they always needed a CLOMR because they had to get a variance from a CLOMR. Back in 2008, CLOMR requirement. The city then changed its ordinance in 2012. I don't know who was there for the city. It was probably an engineer or something, and of course he knows the law of the city is you need a CLOMR. Their complaint then says in paragraphs 87 and 88, the process worked. They took that information. They went to higher ups in city management. City management, paragraph 88 said, we didn't know about the CLOMR. Do you have a variance? Of course you don't have to get a CLOMR. And then they go on to complain about the CLOMR, which they've been told they don't need. And so for much of this case, I proceeded through what count one says, thinking that the right they were serving that had been taken from them was the reimbursement right to the $3.2 million bridge. Now the $3.2 million bridge was constructed, again, according to their complaint, pursuant to an old contract. The parties released each other from that contract. And then the current development agreement was signed in 2018 and it's not just the city. There's another party that's not here. The Mesquite Medical Center Management District. It's a separate governmental unit created by the legislature, and it's a party to this contract. In fact, it is the party with the obligation to pay them money. It is not the city's obligation to pay them anything. Any of this $3.2 million, $11 million reimbursement right, it doesn't come from the city. It comes from the zone fund, which is a fund that's going to be comprised of, would have been comprised of. Assessments levied by the MMD, who's not here, and what's called TIF increment financing, which basically means, really quickly, to the extent the property goes up in value, the percentage of that increased tax revenue goes into this fund. The city is the rest of it. But it's not from the city's coffers. It's not a liability on the city taxpayers. Okay, that's all helpful, but the district court didn't rule on the basis of that. Correct. I'm just trying to give a little context. Now, I think Preston Hollow is the answer. I mean, it's the first substantive paragraph of that case that says, termination of the contract is not taken. And that's essentially what we have. As you pointed out, Judge Higginson, this is basically they're accusing the city of inaction. There was a vote not to do anything. They had not voted at all. I mean, the contract terminated by its own terms. And so, fundamentally, the question is, what did the city take? We're talking about a regulatory taking under Cedar Point Nursery v. SEED, a 2021 Supreme Court. We're saying a regulatory taking is a restriction on what you can do with your property. We haven't restricted them from doing their property, and there's no allegation to it. We didn't take the bridge. The bridge is theirs. It's on their property. It's not been dedicated to the city. There's no obligation to that. We have a property right on the bridge. And so, I think Sun Oil, which he cited, is actually very useful. And I'll read from Sun Oil. It says, when defendant comes down from its position of sovereignty and enters the domain of commerce, it submits itself to the same laws that govern its individuals there. Skipping a little. Remedies for violation of any of these rights by clamps must be directed at defendant in its proprietary capacity and not in its sovereign capacity. But we know from cases like Stockton East, which you've probably read, Stockton East, the Federal Circuit decision, that you can plead in the alternative. And the district court's ruling was pretty succinct as I don't see alternative briefing. And, in fact, they conceded that. If you look at page 30 of their principal brief, Your Honor, it actually says the pled contract can't claim is legally and factually distinct from the taken contract. And so, it's not pled in the alternative because it's not there. And you're correct, Judge Fitzwater did recognize that. The district court, I believe, was also a point made by Judge Ho in Preston Hall. And, I mean, you're right. And in the reply brief, they say separately and independently. Correct. But then his point on the 28J is to citing to the district court, you don't need the magic word. And even if you did, it's at those early paragraphs 22 and 23. We intend these to be alternative claims. Certainly, you don't have to use the magic words of pleading in the alternative. But if you actually look at the pleading in the context of what is in count one, in the complaint, the only allegation there is regarding this reimbursement right. It's the reimbursement right of $3.2 million, which the city didn't know. And so when the courts talk about a city taking contracts, there's a difference between taking a contract and taking contracts with rights and interfering with a contract. And the cases say this over and over again. One of the cases I included in our 28J letter yesterday is a case called Kearney. It's a court of claims case, pre-Federal Circuit. I don't know where this is, the Rolls-Royce case. And so there was a manufacturer, and it was Rolls-Royce, and they were manufacturing engines, and a private entity had, you know. Maybe just distill it down to a rule, because those 28Js, both sides, filed those last night, which is why neither of you responded. Most of the cases cited predate when you filed your briefs. So it's just not going to be that helpful. I can tell you I haven't been able to read them all.  But, so what's the rule? The long and short of it is the government sovereignly said we need the first engine. And that interfered with the private entity's contract. And that was not a taking because what did the government get? It got an engine and it paid for it. That's a sovereign act. The Defense Production Act was utilized. And that was not a taking of the contract because the contract was merely interfered with, not taken. If I'm going to take a contract, and you're going to get 20 widgets, I'm going to take your 20 widgets that are under the contract, then I've taken your contract. If the government has sovereignly interfered with a contractual right, and there are many cases that say this, But even Preston Hollow, which had much less of any commercial feature to it, acknowledged things like statutes and ordinances display sovereignty. And so the difficulty to this case, I think, is there's intermingling of what began as a huge commercial dispute, but then towards the end, at a decisive stage, there were some decisions not to vote by the city council. Those decisions not to vote were contractual decisions. I think they purely were. And I don't think the other side really even contests this. The act they are trying to say, and it's easy to mention, like my friends mentioned, that it's the city's regulatory powers that they're complaining about. And that's really about the CLOMR. But again, we don't have factually here any requirement that the CLOMR ever be complied with. And that goes back to the DMR before case. This court has said over and over again, and I didn't bring this up until the 28th day because it really wasn't an issue until the reply was filed. Like, takings claims simply are not right until there's a final decision. And what is the CLOMR final decision here? A mid-level employee telling them they will need a CLOMR? That's not sufficient for a takings claim to become right. Because we know, again, from their complaint, how the process worked. That got informally appealed up. Management told them, you don't need this. There was never an application. There's never an application denial plan. This was all activity that was taking place, mind you, basically five years after this agreement had been filed and at the last minute before it was gonna expire. When by their own letter to the city, they weren't gonna be able to fix what needed to be fixed within six months anyway because tech staff wasn't gonna be able to approve it in time. And so coming to the city for a six-month extension, I mean, they didn't say it out loud, but they said it on paper, practically not gonna get it done. There's gonna need to be another one and another one. And by the way, there's a third party that has to sign it on this too, even if the city had agreed to it. And so one of the things that strikes me is what is the public use here? And I know that we've kind of not even talked about that, but what did the city gain? The city has no extra bundle of sticks. Nothing is taken out of the appellant's bundle of sticks. We don't have a light on the property. We're not restricting their use of the property. They can go use the property as it is. And that's the traditional Penn Central Investment Bank expectations analysis, isn't it? We look at the regulations that are in place at the time of acquisition of the property, that's low partners from the federal circuit, and we say, what has the city done to restrict that? And the answer here is nothing. The city hasn't done it. No regulation has been passed or imposed upon them that interferes with their right to use that property, and city management has to recognize they have a clone of their own city. And so we look at the other Penn Central factors, economic harm. What's the economic harm? Usually when we're talking about economic harm under Penn Central, we're talking about the value of the property. What's the value before and what's the value after? Because we kind of analogize that. This is probably how you predict the state litigation will play out, but the district court didn't resolve this by applying the Penn Central factors. I understand that. So maybe just for now, if you could stick to defend, are you defending the district court's decision that this is a pleading deficiency?  And if so, why would it have been dismissed with prejudice? Well, the federal taking claim should be dismissed with prejudice because the federal taking claim on the face does not state a taking of the state with a violation of the amendment. It is, as you said, I think, controlled by President Harlow. It's a contractual claim. Now, back in the state court, we have made the same argument because the same law exists in the state of Texas as exists in the federal courts about this contractual sovereign distinction. The Texas Supreme Court has perhaps poetically referred to it in a very Texas way as the government has two hats and you can only wear one hat. It's a sovereign hat and a contractual hat. When you have one hat on, you can't wear the other hat at the same time. Preston Harlow makes that point. The Texas Supreme Court has made that point in a whole case called Little Tex. And so Judge Harlow and Preston Harlow makes the point. These things don't lead into each other. If you're acting sovereignly, you're acting sovereignly. If you're acting contractually, you're acting contractually. And that corresponds to, again, what Son of Oil says. I'm not sure that bright line still exists. If you have a federal court of claims case that says that sort of utter divisibility is true, I really thought it had become the opposite. You can breach your contract, but you can also step in as the sovereign and relieve yourself of your contractual duties. Those two can be alleged at the same time. Well, if you look at Preston Harlow and you look at the First Circuit case, and I'm going to butcher the name, and I apologize. I think it's Maso Torielas. It's in the brief. Yes, it is in the brief that it relied upon. What those cases say is that for the act of the government to be a taking, it has to be an act taken pursuant to law. So it has to be taken pursuant to an ordinance, to a regulation, to a statute that is circumstantial. And certainly the act here that is alleged to be the causal act, the vote no or the vote to not vote or the refusal to vote, however you want to phrase it, that's not an action that this city council is taking pursuant to a law. It's not taking it pursuant to an ordinance. It's a totally discretionary act. And whether or not they want to extend the deadline of a contract they entered into. And that's what we're talking about. We're talking about a deadline that had run. And their only complaint about the city's action during that time frame is, again, this kind of two-month plomer period at the very end where a middle person said, you need a plomer. They said, no, we don't. And the city agreed. And so, again, I point to exhibit B, the complaint. If you go through that letter that my friend over here actually composed, he explains how COVID got in the way. They had hired some people from Kinley Horn and they got bailed left. And so they had a lot of real problems that were slowing them down, and I understand that. But that doesn't compel the city to extend its contractual obligations just because they had trouble meeting their terms of the contract. And so I think that is the distinction here. Could there be a hypothetical scenario where the government is in a bad contract and so it changes an ordinance to make the contract impossible? You know, lo and behold, there's an example in Texas law and a lawsuit going on right now that's that exact point because we have a law that was passed in the state of Texas that allowed people in the ECJ of cities to remove themselves. And there are cities with agreements with developers. And so the state has actually made it impossible for the cities to bring those people pursuant to those agreements into the city's jurisdiction. So that might be a situation where we could have something like that, where the state, using a sovereign power, intentionally frustrated. And in fact, there is a case, Your Honor, and I just remembered it. Lynch is a Supreme Court case from 1934, I think. It's called Lynch versus United States, I believe. What Lynch is, is Lynch was a circumstance where there were individuals from the war, the First World War, who had insurance contracts with the government and Congress passed an act saying you could no longer sue at all to recover on those contracts. The government is now sovereignly immune from those contracts. And the United States Supreme Court said, that is a taking. You have taken away the remedy. And taking away the remedy is different. That's a taking. Otherwise, it's breach of contract. There may be immunity. That's a different question. I mean, my friend was talking about sovereign immunity. We're a city, we don't have sovereign immunity. We have governmental immunity. There's some briefing in the principal brief about Lawson too, and I think we're past the claims act factors. It's not applicable here. But that is the circumstance where the government's sovereign action frustrates contractual rights to such a degree that, in fact, there is a taking. Because it's taken away. It's just as it is with the contract. Just like I said before. You've taken away the contractual remedy. And so there's no way to recover your contract rights. Even if there is immunity currently under state law. And we'll find out. Is there any relevance to the fact that different relief was sought under each different contract in taking claims? Does that illuminate this at all? As pledged? Mm-hmm. Only to the extent I think it bolsters the... shows as true the idea that these are different claims. I mean, they're not the same claim. There's a taking claim, there's a separate breach of contract claim, which is talking about we didn't act in good faith that has nothing to do with the taking claim as pledged before this court. And so those are the things. I did want to briefly talk about the declaratory judgment issue. So there is a federal declaratory judgment claim that Fitzwater dismissed the taking claim the man of the state law claims. And he says in his opinion, I'm dismissing the federal declaratory judgment claim. Which makes sense, because there's no federal question jurisdiction if the taking claim is gone. And therefore there cannot be a federal declaratory judgment claim. I am of the opinion that was done without prejudice. We have acted in trial court and state court as if that was done without prejudice. This court's precedents say that was done without prejudice. I'm not up here saying that was a dismissal of all declaratory judgment actions for all time of prejudice. This court had an opinion called Lucky Tunes No. 3. It was back in 2020. I think it's in the federal appendix. But it makes that point. The district court's order doesn't say if it was done without prejudice with regard to the declaratory judgment. But we're dealing with a remedy, not a claim. And so anything that's dismissed... Was there a state claim pending at the time? In that case? Yes, sir. In this case? In this case. How do you mean? In other words, when he said, oh, the declaratory judgment ruling, when he said that the only state case was one that was going to come about, there wasn't anything pending at the time. All of the belief wrapped up in this case was in this case in the federal district court. And so he remanded the breach of contract claim, the separate one that we've discussed, and he dismissed, again, the FDJA claims to go back down. And again, they are not Texas declaratory judgment claims. So he did not dismiss those. In sum, Your Honors, we think Preston followed controls. This is not a situation where there are no contractual remedies. There are plenty of contractual remedies. Counsel even alluded to the fact that he may amend his state court and add a contractual claim. And so we believe that for all these reasons, the district court's dismissal should be affirmed. And thank you for your time today. Appreciate it. Thank you, Your Honor. We'll walk and cover five minutes here. If the court would indulge me just simply to go to the exhibits and look at page 30 of 46, ID number 622, that would be an exhibit that was furnished to the appellants as part of the approval process. It's a formal approval process of the city. It's a required action. That's where all of the various component parts of the city gather together to talk about what's required. And it's a little hard to read here, but if you've got it electronically, you can bring it up. It says, Revisions to the FEMA-regulated flood fund will require a CLOMA. That's exactly what they told us. This is not some rogue person going off half-cocked. What happened is that once they told us that, we did go to the city manager and said, What does that mean? And that's what precipitated their very first letter that is in the exhibit, which is page ID 593. It starts from page 1 of 46. It carries through to page 7 of 46. Do any of yours have the BAID stamps? The ROA stamps? Oh, these are the ROA stamps. Yes, these are all stamped as part of the record. If the court would just go to that, it would say, Basically what we asked the city to do, it's sophistry to say that in a situation of economic development, a city is wear two hats. They do. They have a sovereign obligation to do development. They have a contractual obligation to represent the community in their contracts. But what the Horowitz rule says, which is what Preston Howell is based on, is that so long as they're not acting towards their individualized contractual components, then sovereign immunity bars the claim. The corollary rule is, if they are, then sovereign immunity does not bar the claim. That's what the Salento case talks about. When counsel says that this is not about land, regulatory takings are not all just about land, the Coppola case is about development rights that were afforded. In fact, that's the whole name of the case. It's three-part level. This is not about development. It's about the development rights.  So I don't understand that argument. To say that this was just somebody's idea, that's not how that works. Now, what Collins did was they went to the city and they said, what can we work this out? What can we do? You guys have a new relationship with your workers. You're telling us that you're not going to allow us to honor our vested rights. Our whole concept is based on the notion that we have all these permits and approvals already in place. So what we asked them to do was to give us time to figure out how to resolve that issue. So what we asked for was more time. Why we asked for it is detailed in the letter, especially on page two and following. It says a cloner was previously applied. A cloner was waived. A cloner does not affect the flip. It goes on and on about the cloner. That's exactly what we were talking to them about, is that the city has thwarted our ability to develop this project. And what's not on the record, and what they're arguing, is they're saying we had no other options. We had projects pending, but we couldn't go forward because the process was stopped. So what they did was they put their thumb on the scales, and they said, in our governmental capacity, we're not going to let you continue in an orderly fashion. We'd just interrupt sort of our use and enjoyment of property. He says it only lacked a little while. Well, the court is not estranged from contemporary techies. You don't get to just a little while engaged in a techie. They could say, well, they didn't know about it, but certainly they knew about it. It's part of their record. But what you've described as the Sovereign Act just now has all been a refusal to give you more time. I'm sorry? What you've described is that you came to them in the commercial dispute and said, we need more time. And they just didn't take any action. I would disagree with that. We came to them and said, the reason we need more time is because in your governmental capacity, you thwarted our previously-approved development rights. That stopped us. We need to figure out a way to reconcile your new governmental issue, the way you're going to implement this program. What we ask you to do is to give us more time to do that. So we ask them in both of their capacities. It's not true that a city can only wear one hat during the entirety of the contract. Every time you sit down with a city in one of these major economic development situations, you're talking to them about governmental conduct, and you're talking to them about contractual relationships. And you have to look at the nature and the context of what you're talking about to determine what capacity they're acting in. That's the entire holding of the Horwitz case and the project that comes from that. Thank you both. Thank you. The case is submitted. That concludes our cases for the day. We'll stand in recess until tomorrow morning at 9 a.m.